Anna Y. Park, CA SBN 164242
Sue J. Noh, CA SBN 192134
Rumduol Vuong, CA SBN 264392
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
255 East Temple Street, Fourth Floor
Los Angeles, CA 90012
Telephone:  (213) 894-1083
Facsimile:  (213) 894-1301
E-Mail:  lado.legal@eeoc.gov

Eric Yau, HI SBN 10087
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
300 Ala Moana Boulevard, Room 4-257
Honolulu, HI 96850
Telephone: (808) 541-3133
Facsimile: (808) 541-3390
E-mail: eric.yau@eeoc.gov

Attorneys for Plaintiff
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

## UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>        Plaintiff,<br><br>    vs.<br><br>OCEANIC TIME WARNER CABLE LLC DBA SPECTRUM; CHARTER COMMUNICATIONS, INC.  and Does 1-5 Inclusive,<br>        Defendant(s). | Case No.:<br><br>**COMPLAINT—ADA**<br>  • **Disability Discrimination (Discharge)**<br>  • **Denial of Reasonable Accommodation**<br><br>**JURY TRIAL DEMAND** |

## NATURE OF THE ACTION

This is an action under the Americans with Disabilities Act of 1990

("ADA"), as amended by the ADA Amendments Act ("ADAAA") of 2008, to

correct unlawful employment practices on the basis of disability and to provide

appropriate relief to a class of similarly aggrieved individuals who were adversely

affected by such practices.  As set forth with greater particularity in paragraphs 21

to 32 of this Complaint, Plaintiff United States Equal Employment Opportunity

Commission ("Plaintiff" or "Commission") alleges that Defendants Oceanic Time

Warner Cable LLC (dba Spectrum) and Charter Communications, Inc.

("Defendants" or "Spectrum") are liable for unlawfully discriminating against a

class of individuals due to their actual disabilities by maintaining inflexible

maximum leave and attendance policies that deny additional leave as a reasonable

accommodation. Plaintiff further alleges that Defendants failed to engage in the

interactive process to identify other reasonable accommodations for individuals

with disabilities (including but not limited to providing additional leave and/or

modifying leave policies) and instead discharged them if the individuals did not

resign.

## JURISDICTION AND VENUE

1.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345.  This action is authorized and instituted pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, and Section 107(a) of the ADA, 42 U.S.C. §12117(a) (incorporating the powers, remedies, and procedures set forth in Sections 706 of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-5, into ADA enforcement actions).

2.     The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Hawaii.

## PARTIES

3.     The Commission is an agency of the United States of America, charged with the administration, interpretation and enforcement of the ADA, and is expressly authorized to bring this action by Section 107(a) of the ADA, 42 U.S.C. §12117(a), which incorporates by reference Title VII's Section 706(f)(1) and (3), 42 U.S.C. §2000e-5(f)(1) and (3).

4.     At all relevant times, Defendant Oceanic Time Warner Cable LLC dba Spectrum has been a corporation doing business in the State of Hawaii, and has continuously had at least fifteen (15) employees.

5.     At all relevant times, Defendant Oceanic Time Warner Cable LLC dba Spectrum has continuously been an employer engaged in an industry affecting

commerce under Section 101(5)(A) of the ADA, 42 U.S.C. §12111(5)(A), and

Section 101(7) of the ADA, 42 U.S.C. §12111(7), which incorporates by reference

Sections 701(g) and (h) of Title VII, 42 U.S.C. §2000e(g) and (h).

6.     At all relevant times, Defendant Oceanic Time Warner Cable LLC

dba Spectrum has been a covered entity under Section 101(2) of the ADA, 42

U.S.C. §12111(2).

7.     Since at least 2016, Defendant Charter Communications, Inc. has been

a corporation doing business in the State of Hawaii, and has continuously had at

least fifteen (15) employees.

8.     At all relevant times, Defendant Charter Communications, Inc. has

continuously been an employer engaged in an industry affecting commerce under

Section 101(5)(A) of the ADA, 42 U.S.C. §12111(5)(A), and Section 101(7) of the

ADA, 42 U.S.C. §12111(7), which incorporates by reference Sections 701(g) and

(h) of Title VII, 42 U.S.C. §2000e(g) and (h).

9.     At all relevant times, Defendant Charter Communications, Inc. has

been a covered entity under Section 101(2) of the ADA, 42 U.S.C. §12111(2).

10.     In 2016, Charter Communications, Inc. acquired ownership of

Oceanic Time Warner Cable LLC. Charter Communications, Inc. engages in the

same business and continues the same operations as Oceanic Time Warner Cable

LLC, including but not limited to, operation of the facilities in Mililani, Hawaii.

Former employees of Oceanic Time Warner Cable are now considered as Charter Communications, Inc. employees, provided with job descriptions by Charter Communications, Inc. and operate from the same facilities.

11.    Charter Communications, Inc. knew or should have known of Charging Party Mariah Galera's Charge of Discrimination against Oceanic Time Warner Cable LLC filed prior to Charter Communications, Inc.'s acquisition of Oceanic Time Warner Cable LLC. Mr. Chad Tanaka, Ms. Galera's Customer Care Supervisor and Oceanic Time Warner Cable LLC employee at the time, is now employed with Charter Communications, Inc. Moreover, Ms. Ardis Murayama, Oceanic Time Warner Cable LLC's Human Resources Business Partner responsible for administering the new hires/transfers attendance policy that Ms. Galera was subjected to, is now Charter Communications, Inc.'s Human Resources Director for Customer Operations and administers the same attendance policy for newly hired Charter Communications, Inc.'s employees. Ms. Murayama was also responsible for administering the maximum leave policy with respect to class member, Mr. Xavier Herrera, and continues to do so to date. After the acquisition, the President changed from reporting to corporate management of Time Warner Cable to now reporting to Charter Communications, Inc.'s corporate management. By the same token, the Director of Human Resources changed from reporting to corporate Human Resources of Time Warner Cable to now reporting to Charter

Communications Inc.'s corporate Human Resources.

12.    Since the acquisition, employees' requests for accommodations and leave are submitted to a centralized electronic mail account with Charter Communications, Inc. and all correspondences related to such requests bear Charter Communications Inc. in their letterheads. All such requests are now handled by both corporate employees of Charter Communications, Inc. and local Human Resources personnel like Ms. Ardis Murayama, in accordance with the policies established by Charter Communications, Inc.

13.    Charter Communications, Inc. is a successor entity that is in a position to provide the full scope of remedies available including, monetary relief and injunctive remedies.

14.    All of the acts and failures to act alleged herein were duly performed by and attributable to all Defendants, each acting as a successor, agent, alter ego, employee, indirect employer, joint employer, integrated enterprise and/or or under the direction and control of the others, except as specifically alleged otherwise. Said acts and failures to act were within the scope of such agency and/or employment, and each Defendant participated in, approved and/or ratified the unlawful acts and omissions by the other Defendants complained of herein. Whenever and wherever reference is made in this Complaint to any act by a Defendant or Defendants, such allegations and reference shall also be deemed to

mean the acts and failures to act of each Defendant acting individually, jointly, and/or severally.

15.     Plaintiff is ignorant of the true names and capacities of each Defendant sued as Does 1 through 5, inclusively, and therefore Plaintiff sues said defendant(s) by fictitious names.  Plaintiff reserves the right to amend the complaint to name each Doe defendant individually or collectively as they become known.  Plaintiff alleges that each Doe defendant was in some manner responsible for the acts and omissions alleged herein and Plaintiff will amend the complaint to allege such responsibility when the same shall have been ascertained by Plaintiff.

## STATEMENT OF CLAIMS

16.     More than thirty days prior to the institution of this lawsuit, Charging Party Mariah Galera filed a charge of discrimination with the Commission alleging that Oceanic Time Warner Cable violated the ADA by discharging her for violating the attendance policy when her medical conditions caused her to exceed her allowable unexcused absences, and that Oceanic Time Warner Cable also subjected other individuals as a class to discrimination on the basis of disability, after which the Commission investigated the charge of discrimination.

17.     On April 2, 2018, the Commission issued to Oceanic Time Warner Cable/Spectrum a Letter of Determination finding reasonable cause to believe that Oceanic Time Warner Cable/Spectrum had violated the ADA by discriminating

against Charging Party and a class of similarly situated individuals due to their disabilities when they failed to engage in the interactive process and refused to provide a reasonable accommodation resulting in their actual or constructive discharge. Growing out of the investigation, the Letter of Determination also found reasonable cause to believe that Oceanic Time Warner Cable/Spectrum discriminated against a class of individuals based on their disabilities by discharging them once their leave was exhausted without engaging in the interactive process and requiring them to return to work without work restrictions. The Letter of Determination also invited Oceanic Time Warner Cable/Spectrum to join with the Commission in informal methods of conciliation to endeavor to eliminate the discriminatory practices and provide appropriate relief.  The Commission engaged in communications with Oceanic Time Warner Cable/Spectrum to provide the opportunity to remedy the discriminatory practices described in the Letter of Determination.

18.     The Commission was unable to secure from Oceanic Time Warner Cable/Spectrum a conciliation agreement acceptable to the Commission.

19.     On June 8, 2018, the Commission issued to Oceanic Time Warner Cable/Spectrum a Notice of Failure of Conciliation.

20.     All conditions precedent to the institution of this lawsuit have been fulfilled.

21.    Since at least 2014, Defendants have routinely denied leave as a reasonable accommodation to employees with disabilities and imposed attendance-related qualification standards that tend to screen out individuals with disabilities, in violation of Sections 102(a), 102(b)(5)(A), and 102(b)(6) of Title I of the ADA, 42 U.S.C. § 12112 (a), (b)(5)(A), and (102)(b)(6).

22.    Specifically, Defendants maintain a new hire/transfers attendance policy wherein they discharge employees with disabilities who incurred two unpaid instances of leave within their 180-day probationary period even though some or all of the leave was disability-related and additional leave would not impose an undue hardship. In addition, for nonprobationary employees, Defendants maintain maximum leave and excessive excused absences policies wherein they discharge employees with disabilities who have exhausted their FMLA leave, union contract leave or who are deemed to have accumulated too many absences, even though the absences are disability-related and even though additional leave would not cause an undue hardship.

23.    In conjunction with enforcing these policies, absences that are not specifically referenced in Defendants' attendance policy are counted towards progressive discipline. The attendance policy states that "employees on scheduled and approved vacation, scheduled and approved holidays; scheduled and approved personal days; jury duty, witness duty, or military duty; work-related

injuries/illnesses covered by workers' compensation; authorized emergency or bereavement leave; leave granted under Hawaii Family Leave Law (HFLL) and the Federal Family and Medical Leave Act of 1993 (FMLA); absences by eligible employees pursuant to Company Policy on leaves for crime victims and victims of domestic violence or sexual assault, or paid sick leave under Section 378-32 of the Hawaii Revised Statutes or any authorized formal leave of absence are not considered "absent" for the purposes of progressive discipline and correction under these guidelines."

24.    Medical leave and disability-related leave of absence are not specifically referenced as absences that are excused towards progressive discipline in the attendance policy, and Defendants failed to consider reasonable accommodation with respect to employees' requests for leave. As a result, Defendants violated the ADA by failing to engage in the interactive process and failing to provide reasonable accommodations and by subsequently discharging employees who had known disabilities and who have been deemed to have exhausted allowable unpaid absences, leave under the Family Medical Leave Act of 1993 ("FMLA") and union contract, and/or other pre-approved leave of absence.

25.    Under Defendants' excessive excused absences policy, employees can be discharged for excessive disability-related absences even when such absences are excused. Specifically, the policy states "because of the negative impact of a

high volume of absences on the expectation of the Company that the employee will regularly perform his or her work, the Company may also discharge employees for excessive absences, even though excused. The Company's ability to impose termination in these cases stems from management's authority to control its operations and does not stem from its right to discipline employees. In some cases of temporary disability, although excused, the Company may not apply the discipline guidelines where the volume and duration of the absences are a concern to the Company. The employee will be notified in writing, however, at the point such absences become excessive and told that at a date certain in the future, the employee will be discharged if such absences continue."

**New Hires/Transfers Attendance Policy**

26.    The application of the new hire/transfers attendance policy wherein employees in their first 180 days of employment are considered to be in their introductory period and could be discharged after incurring two unpaid absences even where such absences are disability-related, has resulted in the denial of reasonable accommodation and systematic discharge of individuals with disabilities.

27.    For example, Mariah Galera worked as a Customer Service Representative between May 12, 2014 and October 31, 2014.  As a Customer Service Representative, Ms. Galera was primarily responsible for responding to

customer requests, via telephone, for new, upgrade, downgrade, transfer, disconnect and or repair of cable, internet and phone services. Ms. Galera performed her duties satisfactorily and merited a promotion and a pay increase.

28.    Sometime during her employment, Ms. Galera started experiencing headaches that substantially limited her ability to concentrate and breathe. On September 30, 2014, Ms. Galera informed Ms. Romy Hatae, Lead Customer Service and Mr. Chad Tanaka, Customer Service Supervisor, that she needed to leave work early due to a very bad headache that was affecting her ability to concentrate at work. Mr. Tanaka allowed her to leave as Ms. Galera had sick hours available. Ms. Galera was unable to return to work until October 11, 2014.  On or around October 21, 2014, Ms. Galera was told that she had exhausted her sick hours and received a written warning pursuant to the new hire attendance policy in a meeting with Mr. Tanaka. At the meeting, Ms. Galera explained to Mr. Tanaka that she was awaiting to see a specialist in November 2014 in order to obtain a diagnosis.  On October 22, 2014, Ms. Galera had another bad headache that affected her ability to concentrate at work and asked Ms. Hatae if she could leave. Ms. Hatae told her to "stick it out" since she had no sick leave left. Ms. Galera eventually worked through her entire shift.  On October 24, 2014, Ms. Galera informed her supervisor that she had to go the Emergency Room for an elevated heart rate, and was unable to work until October 31, 2014. After Ms. Galera left the

Emergency Room, her boyfriend drove Ms. Galera to work so that she could

provide Mr. Tanaka with her doctor's note informing him that she would be out but

that she would be able to return on October 31, 2014. On October 31, 2014, Ms.

Galera, through her union representative, provided Human Resources Partner, Ms.

Ardis Murayama, with a doctor's note stating that she would not be able to work

until November 7, 2014. Ms. Galera was expected to obtain a diagnosis from a

specialist relating to her headaches and other medical conditions on or around

November 7, 2014.  Ms. Galera requested Defendants to provide her with

additional leave or excused absences for her conditions until she was able to obtain

a diagnosis.   Notwithstanding her request, Ms. Galera was terminated on October

31, 2014, after incurring her second unpaid absence pursuant to the new hire

attendance policy. Ms. Galera could have returned to work and fully performed her

role as a Customer Service Representative if given additional leave/excused

absences to obtain a diagnosis on or around November 7, 2014 and receive

treatment for her conditions. Due to Defendants' inflexible and arbitrary policy of

not allowing leave/absences beyond the two unpaid absences under the new hire

attendance policy, Defendants violated the ADA by not engaging in the interactive

process to determine if Ms. Galera could be provided with other reasonable

accommodations, including but not limited to additional leave and/or modification

of leave policies, that would enable her to have adequate time to recover from her

medical conditions and return to work. Other individuals with disabilities were also terminated pursuant to the new hire attendance policy despite their need for additional disability-related leave or modification of leave policies.

**Maximum Leave Policy**

29.     The application of the maximum leave policy, described above, has resulted in the systematic discharge of individuals with disabilities, including but not limited to Tarah Ramos, Xavier Herrera and William Low, who sought to exceed Defendants' arbitrary maximum leave allotment. In applying the qualification standard, Defendant failed to consider whether additional leave was needed for disability-related reasons and would not have posed an undue hardship.

30.     For example, Class Member Tarah Ramos worked as a Customer Service Representative between December 15, 2010 and March 2014 and satisfactorily performed her duties of rendering quality customer service. As a Customer Service Representative, Ms. Ramos was primarily responsible for responding to customer requests, via telephone, for new, upgrade, downgrade, transfer, disconnect and or repair of cable, internet and phone services. During her employment, Ms. Ramos suffered from Type 1 diabetes and chronic migraines which substantially limited her endocrine functions and ability to concentrate. On or around 2012, Ms. Ramos requested and was granted intermittent FMLA leave of 3-4 days a month to cover for her diabetes and 4-6 days a month to cover for the

chronic migraines when she could not attend work.  In March 2014, Human

Resources personnel Ms. Liane Oshiro informed Ms. Ramos that her leave would

be discontinued upon the exhaustion of her FMLA leave and she was given the

option to resign or be discharged, even though she was fully working and not on

leave at the time. Ms. Ramos then asked Ms. Liane Oshiro if her existing

intermittent leave accommodations could be continued as she still needed the

accommodations to handle her diabetes and chronic migraines on days that she was

affected but Ms. Oshiro responded that her request for continued intermittent leave

could not be met because she had exhausted her FMLA leave.  Defendants treated

Ms. Ramos' request for continued intermittent leave as an FMLA leave request, as

opposed to an ADA request for accommodation, and violated the ADA by not

engaging in the interactive process and by failing to provide reasonable

accommodations (such as additional intermittent leave and/or modification of leave

policies) that would enable her to continue performing the essential functions of

her job and as a result, Ms. Ramos was terminated when she refused to resign.

31.     Class Member Mr. Xavier Herrera worked as a Customer Care

Representative between January 4, 2016 and October 11, 2016 and satisfactorily

performed his duties of rendering quality customer service. As a Customer Service

Representative, Mr. Herrera was primarily responsible for responding to customer

requests, via telephone, for new, upgrade, downgrade, transfer, disconnect and or

repair of cable, internet and phone services. During his employment, Mr. Herrera

suffered from spinal stenosis and slipped disks, and began taking leave as the pain

substantially impacted several life activities, including but not limited to: ability to

turn his head to the right and ability to stand or sit for long periods of time. While

Mr. Herrera was on leave, he undertook therapies, magnetic resonance imaging

(MRIs), saw different specialists and kept Human Resources Personnel Ms.

Rashonda Carter and Ms. Ardis Murayama informed of his medical conditions

through submission of doctors' notes.  On September 8, 2016, Defendants sent Mr.

Herrera a letter informing him that his 3 month leave of absence, as provided for in

the union contract, would expire on October 8, 2016 and that he would be placed

on a recall list while awaiting a full medical release to return to work if he did not

return to work before that date.  In late September 2016, Mr. Herrera met with

Union Steward and Team Lead for Sales, Ms. Prudence Quebatay, to inform her

that he needed more time before he could return to work as he was still having

difficulties with standing and sitting due to his spinal stenosis and slipped disks,

and asked if his leave of absence could be extended by about 2-3 months. Ms.

Quebatay conveyed Mr. Herrera's request for additional leave to Human Resources

Business Partner Manager, Ms. Ardis Murayama, who immediately rejected the

request stating that the union contract only provided for 3 months of leave.

Fearing that he would lose his job, Mr. Herrera returned to work on October 5,

2016 despite suffering from immense pain after Defendants provided him with a shortened work schedule where he would only be required to work 6.5 hours a day. Mr. Herrera had to stay away from work for the next few days when he could no longer handle the pain.  Defendants terminated Mr. Herrera on October 11, 2016 stating that since Mr. Herrera called out sick again within 60 days of his return on October 5, 2016, he effectively exhausted his 3 months of leave and was placed on the recall list pending a full medical release to work.  Defendants refused to treat Mr. Herrera's request to have his leave extended by another 2-3 months as a request for accommodations under the ADA, and violated the ADA by not engaging in the interactive process and by failing to provide reasonable accommodations (such as additional leave and/or modification of leave policies) that would enable him to have adequate time to recover from his medical conditions and return to work. Indeed, Mr. Herrera was fully cleared to return to work on or around February 2017, and was rehired for the same position in March 2017. Upon his return, Mr. Herrera was categorized as a "re-hire" and lost his seniority.

### Excessive Excused Absences Policy

32.    In enforcing the excessive excused absence policy, described above, Defendants failed to review requests for additional leave as accommodations under the ADA and thereby violated the ADA by failing to engage in the interactive

process and by failing to provide additional leave as a reasonable accommodation even when it would not pose an undue hardship. For example, Class Member Mr. William Low worked as a Field Operations-Installer between August 2011 and December 2015. As an Installer, Mr. Low was responsible for installing and trouble-shooting internet, cable and television services for customers across Oahu based on service requests, and worked primarily in the Hawaii Kai, Kaneohe and Joint Base Pearl Harbor Hickam areas. Mr. Low was also responsible for disconnecting internet, cable and television services when required.  Sometime in or around mid-2015, Mr. Low developed anxiety and depression which substantially impacted several life functions, including but not limited to: his ability to concentrate.  Mr. Low saw a psychiatrist through Defendants' Magellan Program and was advised to take leaves of absences to help alleviate his anxiety and depression. Mr. Low used his vacation time to take a two-week leave of absence as well as longer weekends to help handle his conditions. After these leaves of absences, Mr. Low returned and fully performed his work as an Installer. At the time of Mr. Low's discharge on or around December 2015, he was on a two week leave of absence for depression and anxiety when Defendants informed Mr. Low that his leave would be cut short and that he would be terminated with immediate effect.  Mr. Low spoke to his supervisor, Mr. Jay Abreu, and requested to be able to continue his leave in order to deal with his anxiety and depression,

and even informed Mr. Abreu that he had sufficient vacation/sick hours to cover

for the two-week leave. Notwithstanding Mr. Low's request to have additional

time off, he was terminated.  Defendants violated the ADA by not engaging in the

interactive process and not providing reasonable accommodations (such as

additional leave and/or modification of leave policies) that would enable him to

return to work once he recovers from his anxiety and depression conditions even

though Mr. Low only needed a few more weeks to handle his medical conditions

and return to work, like his earlier leaves of absences.

33.    The effect of the practices complained of in paragraphs 21 to 32 above

has been to deprive a class of similarly aggrieved individuals of equal employment

opportunities and otherwise adversely affects their status as employees because of

their disability.

34.    The unlawful employment practices complained of in paragraph 21 to

32 above were intentional and caused a class of similarly aggrieved individuals to

suffer emotional distress.

35.    The unlawful employment practices complained of in paragraphs 21

to 32 above were done with malice or with reckless indifference to the federally

protected rights of a class of similarly aggrieved individuals.

## **PRAYER FOR RELIEF**

Wherefore, the Commission respectfully requests that this Court:

A.       Grant a permanent injunction enjoining Defendants, their officers, successors, assigns, and all persons in active concert or participation with each of them, from engaging in any employment practices which discriminate on the basis of disability;

B.       Order Defendants to institute and carry out policies, practices, and programs to ensure that they would not engage in unlawful employment practices in violation of § 102(a) and (b), 42 U.S.C. § 12112(a) and (b);

C.       Order Defendants to make the class of similarly aggrieved individuals whole by providing compensation for past and future pecuniary losses, including appropriate back pay and front pay with prejudgment interest on any lost pay and benefits, in amounts to be determined at trial;

D.       Order Defendants to make the class of similarly aggrieved individuals whole by providing compensation for past and future non-pecuniary losses resulting from the unlawful employment practices complained of above, including emotional pain, suffering, inconvenience, mental anguish, humiliation and loss of enjoyment of life, in amounts to be determined at trial;

E.     Order each Defendant to pay the class of similarly aggrieved individuals punitive damages for its intentional, malicious, and reckless conduct described above in an amount to be determined at trial;

F.     Award the Commission its costs of this action; and

G.     Grant such further relief as the Court deems necessary and proper in the public interest.

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by its Complaint.

Dated: September 17, 2018                Respectfully Submitted

JAMES LEE,
Deputy General Counsel

GWENDOLYN YOUNG REAMS,
Associate General Counsel

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
131 "M" Street, N.E.
Washington, D.C.  20507

By _____
ANNA Y. PARK,
Regional Attorney

SUE J. NOH,
Supervisory Trial Attorney

RUMDUOL VUONG,
Supervisory Trial Attorney

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION